ANNA WORKMAN, Appellee, v. CITY OF SIOUX CITY, Appellant.

No. 42151.

APRIL 3, 1934.

H. C. Harper, A. O. Jepson, and Jesse E. Marshall, for appellant.

Forsling & Cover and C. M. Gasser, for appellee.

MITCHELL, J.—The appellee is a resident of Correctionville, Iowa. On the 6th day of March, 1932, she accompanied her husband in his automobile, driven by him, on a trip to Sioux City from Correctionville, a journey of thirty-six miles. When within the limits of the city of Sioux City, on what is known as the Correctionville road, the automobile skidded on an accumulation of ice existing in the street, and into the pier of an overhead Milwaukee Railroad trestle which crosses the Correctionville road. In the collision the appellee was thrown into the windshield of the automobile and received injuries, principally cuts about the head and face.

Correctionville road is a winding road which traverses the eastern part of the city of Sioux City in an east and west direc-

tion. Beginning about 100 feet east of the place of the accident, the road curves sharply from a southeasterly direction to a westerly direction. Just east of the place of the accident Correctionville road intersects with Logan street to the North, and also with what was then Egbert street to the east. These streets terminate at their junction with Correctionville road and slope downward toward their termini, while Correctionville road east of this intersection slopes downward toward the place of the accident. Correctionville road was originally paved in the year 1915, and in the year 1921 this pavement was widened by adding a 7-foot strip of pavement with a curb to each side of the original pavement.

It was the claim of the appellee that at the place of the accident, a deposit of snow and ice several inches thick had, with alternate thawing and freezing, built up on accumulation during the winter of 1932 and each previous year, and that this condition existed on the day of the accident. At the time of the accident the appellee was riding in her husband's car, which was being driven by her husband. He was an infrequent user of the road. Approaching the intersection from the east on the day in question and making the turn to his left he traveled at a speed of approximately 15 miles per hour. He drove the car from the north and right-hand side of the road and upon and over the ice formation described, concealed as it was by a snow covering. The car skidded on the ice accumulation on the road, slid from the road, over the north curb line, onto the parking, and finally collided with the north pier of the railroad trestle, causing the injuries complained of.

At the close of all of the evidence the city of Sioux City, the appellant, moved the court to direct the jury to return a verdict against the appellee and in favor of the city of Sioux City, upon the grounds, first, that the evidence in behalf of the appellee wholly failed to show any negligence on the part of the appellant; second, that the testimony and evidence on behalf of the appellee showed at most an icy condition on the part of the street reserved for vehicular traffic and failed to show any act or omission on the part of the appellant city of Sioux City upon which any liability could be based. The court overruled this motion, and the case was submitted to the jury, and verdict was returned by the jury in favor of the appellee in the amount of $487.50.

The appellant offered as one of its witnesses a man in charge of the United States Weather Bureau in Sioux City, who had been

in the weather bureau service for a little over twenty-five years, and who kept in his office the official records showing the amount of snowfall and the weather conditions in Sioux City during the years 1931 and 1932. The total amount of snowfall in January of 1932 was 21.9 inches. The normal snowfall for the month of January is 6½ inches. In other words, the snowfall for January of 1932 was a little over three times normal. The average temperature for the month of January was 17 degrees and was slightly lower than normal temperature. On January 16th there were 12.2 inches of snow on the ground on the level, and there was no day during the month of January but that there was snow on the ground, and it varied from around 3 inches up to 12 inches. During the month of February, 1932, the snowfall was 4.8 inches, which is slightly less than normal, and the temperature for February of 1932 was 25.5 degrees, and this is higher than the normal temperature for February. Normal temperature for February is 21 degrees. In March, 1932, there was no snow on the ground on the 1st, 2d, or 3d. But on the 4th of March there was a snowfall of 1.9 inches, and on the 5th there was a trace. Maximum temperature on March 1st was 38 degrees, and on the 2d, 37 degrees, and on the 3d, 37 degrees, and on the 4th, 35, and on the 5th, 14 degrees above zero. The minimum temperature on March 5th was 2 degrees above zero and on March 6th the maximum was 9 degrees above and the minimum 2 degrees below, and on the 6th of March at 7 o'clock p. m. the snow remaining on the ground was 1.7 inches.

Thus it will be seen that during February and March of 1932 there was much freezing and thawing. The fact that the weather bureau records show there was no snow on the ground on March 1st, 2d, and 3d would not necessarily show that the streets were clear of snow and ice, because packed snow and ice do not disappear as readily as snow on the ground, and, in this day and age, with the modern means of transportation, the automobile and the truck, and paved roads, there is almost a continual traffic upon the highways, and as the snow falls it is packed by the heavy cars and trucks that pass along the roadway. This packed snow does not disappear as rapidly as the snow upon the ground.

The appellant assigns two errors for reversal: one that the evidence fails to show a defective construction of the road, and that there was no duty as a matter of law on the part of the city to remove ice and snow from the part of the pavement reserved for

vehicular traffic; second, that the verdict returned was a quotient verdict.

The appellee claims that the appellant was guilty of negligence because of the faulty construction of the roadway at the point in question in not affording sufficient drainage to enable water from the melted snow and ice thereon to escape, and by causing and inducing the accumulation of snow and ice thereon, by intermittent thawing and freezing during the winter months, by reason of it being held on the street because of the faulty and insufficient drainage due to the defective construction of the street at that place; that such condition resulting in the accumulation of such snow and ice constituted a defect, for which the appellant is liable in damages. The appellant denied all of the appellee's allegations of negligence, and specifically claimed. that the construction of the road at the place of the accident was done under the supervision of a qualified and competent engineer and in accordance with the best available engineering advice, and that said road was properly constructed. It is the claim of the appellant that the accumulation of snow and ice at the time and place in question was the result solely of an unusual fall of snow during the winter of 1931–32, and that it was not the result of any defective construction of the roadway in question. If the evidence in this case conclusively shows there was no defective construction in the roadway as claimed by the appellee, then the appellant's contention would be correct. It is the general rule that the city is not liable for damages resulting solely from an accumulation of snow and ice in the streets of the city.

In a very able opinion, written by Justice Evans, in the case of Ritchie v. City of Des Moines, 211 Iowa 1026, this court said at page 1034, 233 N. W. 43, 47:

"The foregoing authorities are sufficient to illustrate the absence of precedent for the recovery of damages against a municipality on the basis of alleged negligence in permitting snow and ice to accumulate upon the general area of the streets. Evidently to recognize a right of recovery upon the evidence in this record, consisting only of proof of the accident and the icy condition of the streets, would be to open up a field of litigation hitherto undiscovered.

"Extreme weather conditions in this climate are inevitable, and

when they occur they are dominant and irresistible. They may overcome municipalities and render puny the highest efforts at due care. When such natural conditions operate to foil human obligations of duty, they are usually deemed in law as acts of God. All that human effort can do is to follow in the wake of the storm and mend the wreckage where it may. .

"Vying with the storm in dominance is the vehicular traffic of the city street. This moves on like a Juggernaut, even in a snowstorm. Powerful as the storm to move forward, it is yet powerless to stop. If, following a snowstorm, it were theoretically possible for a city to furnish immediate transportation sufficient to remove all the snow from all the streets to some remote locality, and to do so in a day, it would usually avail nothing, because the vehicular traffic has already trampled and packed the snowflake ere the storm subsides. There is a quality of absurdity in saying that the city should remove the snow from the streets *before* it becomes trampled and packed."

It would follow, therefore, as a matter of course, that if a city is not under duty to remove the accumulation of snow and ice for the benefit of pedestrians in the street, it would be under no such duty for the benefit of persons riding in automobiles.

The record in this case shows that the winter of 1931 and 1932 brought an unprecedented snowfall in the city of Sioux City. In the month of January alone there was 21.9 inches of snow, which is more than three times the normal snowfall, and this created a bad traffic situation all over the city. The place in question was shaded by the overhead railroad crossing and by the banks and trees on each side. Whatever the drainage system established by the city, whether it was good or bad, snow and ice will melt in the sun and will accumulate and freeze when the resultant water strikes the shade. To hold that the city would be liable in damages for the accumulation of snow and ice in the vehicular part of the roadway during a period of such heavy snowfall and of the thawing and freezing of the ice, would be to establish a rule of liability for cities that would soon force into bankruptcy the few remaining solvent cities in our state. So in this case, if there was no evidence in the record such as would justify the court in submitting same to the jury, of a defective construction of that part of the roadway at the place of the accident, there would be no liability on the part of the city.

It is the claim of the appellant that the pavement at the place in question was properly constructed and properly drained. This was denied by the appellee. The burden to show that the pavement was not properly constructed was upon the appellee. In order to prove this the appellee offered as her sole and only witness a man who was formerly a city engineer of the city of Sioux City, a civil engineer, who had had considerable training and experience. He testified that in his judgment there was not adequate drainage provided and that part of the pavement had not been laid in accordance with good or acceptable engineering practice. He also testified that all he knew about the condition of the pavement at the place of the accident was from observation. That he had been by there on numerous occasions and had observed the condition that existed there. The following is his testimony:

"I did not run any levels and so I couldn't say that the level indications are correct, and with regard to the slope along there all I know is from observation without instruments, but at one time we took the levels of the sidewalk, which was about five years ago. Those levels were taken in response to a complaint which came in relative to the sidewalk about 50 feet from the pier being under water a great deal of the time. I never took the levels of that street and the levels shown on Exhibit 'D' may be correct, I know nothing to the contrary, and the catch basins shown on that exhibit I believe are actually there."

The appellant offered the testimony of the assistant city engineer, a man of experience and training, and who in October of 1932 made a plat of the exact conditions of the pavement and of the street at the place of the accident. This plat was introduced in evidence and marked Exhibit D. The following is the testimony of the assistant city engineer:

"The plat, Exhibit 'D', was prepared by me and was approved by Paul Cook, the City Engineer. The plat was made from measurements and elevations at the place of the accident and was actually surveyed and surveying instruments were used in order to find the levels and the measurements. The plat was made some time around October 10, 1932. The plat indicates the storm sewers and also indicates the levels. The levels were taken from Logan Street west approximately 200 feet at intervals of 25 feet east and west and 6 feet apart. In taking levels we use an assumed elevation of 100 feet

and the other elevation figures on the plat show the elevation above or below the starting point which is marked 100, and the greatest share of the elevation shows that there is a slope toward the west and is ample drainage to take care of water, and on the north side of the street next to the pier the fall is about 1.2 feet in every 100 feet. Good engineering practice requires a drainage fall of 6 inches to the 100 feet and the actual survey on this ground showed that there was nearly twice that much fall in the gutters where these elevations were taken. This was actually surveyed with instruments and we went out with our levels and took the elevations, and the figures on Exhibit 'D' represent the results of the figures taken in the field with the instruments, and according to my experience there is plenty of fall there to take care of any water that may stand in the street. There is slope enough so that the water will find its way into a sewer. We can't design a sewer that will take care of the greatest flood that would come; it wouldn't be economical to design sewers for the largest rainfall and as far as I can see here the drainage system at the place of the accident is in accordance with good engineering practice."

It thus appears from an actual survey of the conditions by a competent engineer, that the pavement was properly constructed. That there is sufficient drainage; in fact, more drainage than good engineering practice requires. The only evidence that the appellee offered was the observation of a former city engineer. And, while it may be that a man trained in the engineering profession is better able to observe with the naked eye the conditions that exist, when he is confronted, as was the witness in this case, with an actual plat made of the conditions that existed at the place of the accident, by an engineer who went out and used levels to find out the actual measurements, it seems to us that his testimony can be given little weight; that even the engineering profession would not want the court to give undue weight to the observations of the engineer when that engineer is confronted with a plat made from measurements and elevations at the place of the accident, which was actually surveyed, and surveying instruments were used in order to find the levels and the measurements. It seems to us that the evidence wholly fails to show any improper construction or drainage. On the contrary, shows not only that the pavement was properly constructed but was in proper condition at the time of the accident. It thus appears that

224

the appellee has failed to prove the improper construction of the pavement at the place of the accident, and that the lower court should have directed a verdict in favor of the appellant at the close of all the testimony.

The judgment of the lower court must be, and it is hereby reversed and this case remanded.

CLAUSSEN, C. J., and EVANS, ALBERT, and ANDERSON, JJ., concur.

STEVENS, KINDIG, KINTZINGER, and DONEGAN, JJ., dissent.